IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UPMC, | |
| Plaintiff, | |
| v. | Case No. _____ |
| | Judge _____ |
| HIGHMARK INC., | *Electronically Filed* |
| Defendant. | |

**COMPLAINT**

**INTRODUCTION**

1.      UPMC comes to this Court to put a stop to a series of false and misleading television, radio, and newspaper advertisements by Highmark Inc. ("Highmark").  These advertisements incorrectly state, among other things, that UPMC will "deny access," "close its doors," or otherwise not allow "Highmark health insurance customers" or "Western Pennsylvania families" to "use UPMC after 2014" (collectively, the "No Access Campaign").  These statements, made as part of Highmark's larger campaign to take 41,000 inpatient admissions away from UPMC and community hospitals on an annual basis, are false for at least four independent reasons.

2.      *First*, as UPMC has publicly stated, starting in 2015, Highmark subscribers will have full, out-of-network access to UPMC's facilities and physicians.  As Highmark well knows, doors will not be shut, access will not be denied, and Highmark health insurance customers will be able to use UPMC after 2014 on at least an out-of-network basis.  It is false for Highmark to say otherwise.

3.     *Second*, Highmark subscribers will have in-network access to certain UPMC facilities and physicians after 2014, as Highmark itself has touted to its members and others. *See* May 7, 2012 Letter from Deborah L. Rice and John W. Paul ("Highmark members will have indefinite access beyond January 2015 to certain UPMC specialty services."). After 2014, Highmark subscribers will be able to receive care, at in-network benefit levels, at Children's Hospital of Pittsburgh of UPMC, Western Psychiatric Institute and Clinic, UPMC Bedford, UPMC Northwest, and UPMC Altoona. In addition, after 2014, Highmark subscribers will have in-network access to emergency services, certain oncology services, and continuing courses of care at UPMC. In-network access to UPMC Mercy will also continue into 2015. Doors will not be shut, access will not be denied, and Highmark health insurance customers can use these UPMC facilities and services on an in-network basis after 2014. It is false for Highmark to say otherwise.

4.     *Third*, "Western Pennsylvania families," and even current Highmark subscribers who switch plans, will have in-network access to UPMC's facilities and physicians through other insurers. Should subscribers want full, in-network access to UPMC after 2014, Aetna, Cigna, UnitedHealthcare, Coventry, and the UPMC Health Plan can and will provide it. Doors will not be shut, access will not be denied, and Western Pennsylvania families and current Highmark subscribers who switch plans will be able to use UPMC's facilities and services on an in-network basis after 2014. It is false for Highmark to say otherwise.

5.     *Fourth*, one of Highmark's advertisements portrays Medicare-eligible seniors and states that UPMC "won't sign a contract that allows Highmark health insurance customers to use UPMC after 2014." This is false because UPMC and Highmark in December 2011 jointly agreed and assured "all Medicare [and] Medicare Advantage . . . subscribers and patients that

their in-network access to UPMC hospitals and physicians will not be affected by the changes in the contractual relationships between Highmark and UPMC." UPMC has reaffirmed—both to Highmark and publicly—its commitment to allowing Medicare subscribers, including those with Highmark plans, continued in-network access to UPMC. UPMC will allow seniors with Medicare uninterrupted in-network access to UPMC after 2014. It is false for Highmark to say otherwise.

6.      Highmark's misuse of the word "access" and similar words and phrases such as "close its doors," "not allowed to go there," and "use UPMC" in its "No Access Campaign" advertisements is confirmed by a federal court ruling issued in a 2001 lawsuit that Highmark filed against UPMC. Highmark took the position in that lawsuit, and convinced the United States District Court, that it was false to represent that out-of-network access was tantamount to no access. The Court concluded that Highmark "subscribers do indeed have access to the disputed [UPMC] facilities and world-renowned doctors," when they use the facilities and physicians on an out-of-network basis, even if "at a lower level of benefits." Highmark cannot take a contrary position to justify its advertisements now.

7.      Highmark's "No Access Campaign" is false and misleading in numerous other respects as well. The advertisements misleadingly represent historical events in the parties' relationship, take supposed news stories out of context to incorrectly tell viewers that those stories support Highmark, and state that the media has endorsed Highmark's claims when that is not, in fact, the case.

8.      Highmark has refused to agree to retract its deceptive "No Access Campaign," even in the face of cease and desist correspondence from UPMC asking Highmark to do so. UPMC, therefore, comes to Court to put a stop to Highmark's misrepresentations.

## PARTIES

9.      Plaintiff UPMC is a not-for-profit corporation organized and existing under the laws of the Commonwealth of Pennsylvania with a principal place of business in Pittsburgh, Pennsylvania.

10.      Defendant Highmark Inc. is a non-profit corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business in Pittsburgh, Pennsylvania.

## JURISDICTION AND VENUE

11.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (Federal Question Jurisdiction) based upon allegations that Highmark's conduct violated the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).  This Court has supplemental jurisdiction over the claims in this action that arise under the laws of the Commonwealth of Pennsylvania pursuant to 28 U.S.C. § 1367(a), because the state law claims form part of the same case or controversy and derive from a common nucleus of operative facts.

12.      This Court has personal jurisdiction over Defendant Highmark as it has ongoing and continuous contacts with this judicial district.

13.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because UPMC and Highmark maintain their headquarters in this district and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this judicial district.

14.      The conduct alleged herein was committed in and affected interstate commerce, including, among other things, the following:

a.     Highmark's television advertisements discussed herein were available to and could be accessed by non-Pennsylvania residents including on television broadcasts on four different stations and websites such as YouTube.com.

b.     Highmark's print advertisements discussed herein appeared in hard copy versions of the *Pittsburgh Post-Gazette* and *Pittsburgh Tribune-Review* that are distributed interstate and, therefore, the advertisements appeared outside of Pennsylvania.

c.     Highmark's radio advertisement discussed herein was broadcast on more than ten different radio stations, including WJAS-1320 AM, which can be heard and accessed outside of Pennsylvania.

d.     Highmark's television advertisements misrepresent stories, articles, and opinions that appeared in the *Pittsburgh Post-Gazette*, *Pittsburgh Tribune-Review*, and aired on KDKA2. These stories also appeared on websites, including www.postgazette.com, www.triblive.com, and pittsburgh.cbslocal.com, that are available to and can be accessed by non-Pennsylvania residents.

e.     The Highmark advertisements discussed herein may have an impact on parties outside of Pennsylvania, including but not limited to employers outside of Pennsylvania that may decide to adopt Highmark plans in their offerings, subscribers to Highmark plans who may reside in another state and commute to Pennsylvania for work, Highmark subscribers with family members living outside of Pennsylvania, and UPMC patients that reside outside of Pennsylvania.

## FACTS

**I.    HIGHMARK NEEDS TO MOVE PATIENTS AND SUBSCRIBERS AWAY FROM UPMC TO SUPPORT ITS NEW BUSINESS MODEL.**

15.    The competitive landscape in Western Pennsylvania's healthcare and health insurance markets is changing, and Highmark's false and misleading advertisements are meant to give Highmark a competitive advantage in this changing landscape.

16.    Competition between UPMC and Highmark has intensified with the Pennsylvania Insurance Department's ("PID") April 29, 2013 approval of the affiliation between Highmark and West Penn Allegheny Health System ("WPAHS") as well as Highmark's closing on affiliations with Jefferson Regional Medical Center and St. Vincent Health System.  This new, official alignment that Highmark sought with WPAHS and other provider systems represents a shift in the market for healthcare and health insurance in Western Pennsylvania.

17.    With the PID's recent approval of the affiliation of WPAHS and Highmark, UPMC and Highmark are now both integrated healthcare delivery systems ("IDFS") and compete directly, not just as insurers, but also as providers of patient care.  UPMC introduced the model of an IDFS to Western Pennsylvania more than 15 years ago with the UPMC Health Plan. Highmark is now trying to replicate this model with WPAHS at its core.

18.    In this new environment, competition for health insurance subscribers and healthcare patients is fierce.  To try to succeed as a newly-formed IDFS, Highmark must not only attempt to expand its subscriber base, but it also must, as one Highmark senior executive testified in August 2012, "obviously" and "absolutely" direct tens of thousands of patients from UPMC to WPAHS, the flagship of Highmark's newly-created Allegheny Health Network.  Highmark's materially false and misleading advertising is meant to do just that.

19.     The PID recognizes that Highmark's IDFS must attract a large number of patient admissions to WPAHS—and away from UPMC—in order to succeed.  Various PID filings and submissions have confirmed that Highmark's newly-created Allegheny Health Network plans to attract approximately 41,000 inpatient admissions to WPAHS and away from UPMC and other community hospitals on an annual basis.  The very success of this Highmark "Base Case" plan— ultimately relied on by the PID—depends on UPMC, after 2014, largely being an "out-of-network option for Highmark policyholders."  Compass-Lexecon Report dated April 24, 2013 (PID Docket No. 1401) at 119; *see also* PID Approving Order and Determination dated April 29, 2013 (PID Docket No. 1413) at 15.  In this sense, Highmark's "No Access Campaign" denies and obscures the one fact that is central to Highmark's "Base Case" to the PID and manifest in the May 2012 Agreement, *i.e.*, Highmark subscribers **will** be able to use UPMC after 2014; their use of UPMC, however, will be largely through out-of-network access.

20.     False and misleading statements denigrating UPMC now, in this environment, will irreparably harm UPMC.  The loss of nearly 41,000 inpatient admissions from UPMC to Highmark and WPAHS—which equates to the annual total volume of admissions at two major UPMC tertiary teaching hospitals, UPMC Shadyside and UPMC Mercy—would cause substantial harm to UPMC's business including, most likely, the closing of facilities and loss of jobs.

21.     Highmark's false and misleading "No Access Campaign" is the latest example of its long-running pattern and practice of Highmark seeking to harm and harming UPMC's business interests.  Highmark's actions have included reducing revenue flow to UPMC through depressed reimbursement rates, propping up the failing WPAHS years before the pair publicly

announced their affiliation, and purposefully sustaining financial losses on an insurance plan to steer patients away from UPMC to WPAHS.

22.     Highmark has always known and believed that its subscribers would have access to UPMC after 2014 both on an in-network basis for certain facilities, services, and physicians and on an out-of-network basis for UPMC's other facilities, services, and physicians. Nevertheless, Highmark has launched its "No Access Campaign" around the false and misleading premise that its subscribers will have no such access in order to tarnish UPMC's reputation, erode its goodwill in the community, and cause it economic injury.

## II.   HIGHMARK'S "NO ACCESS CAMPAIGN" ADVERTISEMENTS MISREPRESENT AND MISSTATE THE PARTIES' RELATIONSHIPS.

### A.     The Parties' Relationships

23.     In 2002, UPMC and certain UPMC hospitals (UPMC Passavant, Magee-Womens Hospital of UPMC, UPMC Presbyterian Shadyside, UPMC Northwest, UPMC St. Margaret, UPMC Horizon, UPMC Bedford, and UPMC McKeesport) entered into "Hospital Agreements" and "Managed Care Hospital Agreements" with Highmark (together, "2002 Hospital Contracts").

24.     The 2002 Hospital Contracts provided that the relevant UPMC hospitals would be in-network for most Highmark subscribers until the expiration date of those contracts.  The 2002 Hospital Contracts had a ten-year term with an expiration date of June 30, 2012.

25.     During the term of the 2002 Hospital Contracts, physician groups owned by UPMC also entered a series of physician contracts with Highmark, pursuant to which the UPMC physicians provided healthcare on an in-network basis to most Highmark subscribers consistent with the benefits and terms of the subscribers' health plans.

26.     In April 2011, Highmark's plan to become an IDFS by acquiring the financially troubled WPAHS became public.  Highmark's goal with the acquisition, which its recent statements confirm, would be to drive patients away from UPMC into its new, captive hospital system, to strengthen its already tight grip on the Western Pennsylvania healthcare market.

27.     UPMC promptly advised the public of the impending expiration of the 2002 Hospital Contracts.  UPMC explained that a renewal of all those contracts would not be possible were Highmark to acquire WPAHS and reposition itself as an IDFS because UPMC is unwilling to place its fate in the control of a competitor like Highmark that has vowed to steer tens of thousands of patients away from UPMC to providers that Highmark controls.

28.     But UPMC also stated that Highmark Medicare and Medicaid patients would not be affected by the expiration of the 2002 Hospital Contracts.  In December 2011, UPMC and Highmark publicly agreed that such vulnerable populations would not be affected by any changes in the relationship between UPMC and Highmark.  UPMC and Highmark issued a joint statement to "assure all Medicare, Medicare Advantage, Medicaid, and CHIP plan subscribers and patients that their in-network access to UPMC hospitals and physicians will not be affected by the changes in the contractual relationships between Highmark and UPMC."  At the time, Highmark estimated that this pledge affected more than 550,000 individuals in Western Pennsylvania.

**B.     The May 2012 Agreement**

29.     In May 2012, as a result of a mediation sponsored by Pennsylvania Governor Thomas Corbett, UPMC and Highmark "reached an agreement in principle to provide for in-network access to all UPMC hospitals and physicians for Highmark Commercial and Medicare Advantage members until December 31, 2014."

30.     The May 2012 Agreement provided, in part:

> [I]n recognition of special local community needs and certain unique services offered by UPMC, and to minimize access to care and rate disputes, Highmark and UPMC have agreed to negotiate rates and terms **_for continued Highmark member access to certain UPMC services on an in-network basis starting in 2015_**, including Western Psychiatric, certain oncological services, UPMC Bedford, and UPMC [Northwest].  (emphasis added)

> \* \* \* \*

> As part of its community benefit mission, **_UPMC will also continue to provide in-network hospital and physician services at preferred rates for certain Highmark plans which serve vulnerable populations_**, specifically Special Care, pa fair care, CHIP and Guaranteed Issue plans, for such time as these plans continue to be offered by Highmark. (emphasis added)

31.     At the time of the May 2012 Agreement, Governor Corbett issued a press release, which was appended to a UPMC-Highmark joint statement regarding the agreement, that confirmed "**_Highmark and UPMC will be negotiating access to unique UPMC services beginning in 2015_**, including Western Psychiatric Institute, certain oncological services and community hospitals."  *See* May 2, 2012 Governor Corbett Press Release appended to UPMC-Highmark Joint Statement (emphasis added).  In that same joint statement press release, Governor Corbett went on to recognize that "[c]urrent agreements stay in place for UPMC Children's Hospital" and that, "[f]or 2015, **_the parties will also negotiate continued coverage and services for vulnerable populations_**, including those enrolled in the Children's Health Insurance Program (CHIP), Special Care, and PA Fair Care, Pennsylvania's plan for persons with pre-existing conditions."  *Id*.  (emphasis added).

32.     Immediately following the May 2012 Agreement, on May 7, 2012, Highmark senior executives Deborah L. Rice and John W. Paul publicized a letter touting that "Highmark members will have **_indefinite access beyond January 2015_** to certain UPMC specialty services,

including Western Psychiatric Institute and Clinic and certain oncology services, as well as some community hospitals—UPMC Bedford and UPMC Venango."  (emphasis added).

### C.     The July 2012 Amendments

33.     Subsequently, in July 2012, UPMC and Highmark entered into a longer-form agreement (the "July 2012 Amendments") that once again confirmed the end date for the 2002 Hospital Contracts as December 31, 2014.

34.     The July 2012 Amendments, however, also provided for "***continued Highmark member access to certain UPMC services on an in-network basis effective January 1, 2015***, including Western Psychiatric, certain oncological services, UPMC Bedford and UPMC Northwest" (emphasis added).  In addition, "Highmark members in a continuing course of treatment at UPMC providers ***will also continue to have in-network access*** at agreed upon rates and terms for hospital and physician services after December 31, 2014" (emphasis added).

35.     In addition, consistent with federal law, Highmark subscribers will continue to have access at in-network benefit levels to emergency services at UPMC after 2014.

36.     Highmark subscribers will also have access at in-network benefit levels to UPMC Altoona after 2014.  Michael Fiaschetti, President of Health Markets, Highmark Health Services, recently publicized this fact in the *Altoona Mirror*:  "Beyond that date [the end of 2014], ***UPMC has committed to preserving in-network access for [Highmark] customers to UPMC Altoona Hospital***."  *See* Michael Fiaschetti, Op-Ed, *Preserving access to health care – at a fair cost,* Altoona Mirror (July 28, 2013) (emphasis added).  He also confirmed, through discussion of exemplar patients, that Highmark subscribers would have out-of-network access to UPMC's other facilities.  *Id*. (discussing Highmark subscribers that "end up at UPMC Presbyterian or another out-of-network UPMC institution for surgery or radiation therapy").

37.     And, as Highmark is well-aware, Highmark's subscribers will have access at in-network benefit levels to UPMC Mercy through June 30, 2015 and Children's Hospital of Pittsburgh of UPMC until at least 2020 pursuant to consent orders with the Pennsylvania Attorney General that govern UPMC's acquisition of these facilities.

**D.     Medicare Commitment**

38.     Also, pursuant to the parties' December 2011 agreement, Medicare, Medicare Advantage, Medicaid, and CHIP plan subscribers and patients will, despite any "changes in the contractual relationships between Highmark and UPMC," continue to have "in-network access to UPMC hospitals and physicians" after 2014.  UPMC has reaffirmed—both to Highmark and publicly—this commitment to allowing Medicare subscribers, including those with Highmark plans, continued in-network access to UPMC.

**E.     In-Network Access to UPMC After 2014**

39.     Therefore, although most commercial hospital contracts between Highmark and UPMC will end on December 31, 2014, Highmark subscribers will have in-network access to UPMC Bedford, UPMC Northwest, UPMC Altoona, UPMC Mercy (through June 2015), Children's Hospital of Pittsburgh of UPMC (until at least 2020), Western Psychiatric Institute and Clinic, emergency services, certain oncology services, and continuing courses of care. UPMC will also offer Medicare, Medicaid, CHIP, and other vulnerable Highmark subscribers continued, in-network access to UPMC.

40.     Furthermore, now and after 2014, individuals in Western Pennsylvania can choose to have access at in-network benefit levels to UPMC's facilities and physicians by purchasing insurance from insurers other than Highmark.  In-network access to UPMC now and after 2014 is available to subscribers through at least Aetna, Cigna, UnitedHealthcare, Coventry, and the UPMC Health Plan.

### F.     Out-Of-Network Access to UPMC After 2014

41.     Beyond these in-network services at UPMC, Highmark subscribers will have full, out-of-network access to UPMC after 2014.

42.     UPMC explained this to Highmark in correspondence dated April 29, 2013. UPMC told Highmark, for example, that "[w]hen the Highmark-UPMC contracts expire at the end of 2014, all Highmark subscribers will be able to access out-of-network UPMC services." UPMC also explained that, "on January 1, 2015, all Highmark subscribers will be able to access all UPMC services out-of-network . . . ."  And UPMC reiterated that "all Highmark subscribers will have full, out-of-network access to UPMC services."

43.     Highmark knows and has known, as reflected in its submissions to the PID and other public statements, that Highmark subscribers would be able to access UPMC on a largely out-of-network basis after 2014.  Even the press has recognized as much, and an August 3 *Pittsburgh Tribune-Review* article regarding two "No Access Campaign" television advertisements stated that, "when it's all said and done, you still will be allowed to go there [to UPMC].  Even if you have Highmark Blue Cross/Blue Shield come December 2014, when their contracts expire, you can go to UPMC.  The difference is it will be considered an out-of-network transaction."  Luis Fabregas, "Seniors needlessly scared?" *Pittsburgh Tribune-Review* (Aug. 3, 2013).

44.     Ultimately, it will be Highmark, not UPMC, that defines its benefit plans after 2014 and decides how much to reimburse subscribers who choose to use these UPMC services out-of-network.

45.     Highmark, therefore, was aware when it ran its "No Access Campaign" advertisements that its subscribers would have full, out-of-network access to UPMC starting in 2015.

III.   **HIGHMARK'S "NO ACCESS CAMPAIGN" ADVERTISEMENTS CONTAIN NUMEROUS FALSE AND MISLEADING STATEMENTS.**

    A.    **Highmark's Television "News Report Ad"**

46.    On or about July 29, 2013, as part of its "No Access Campaign," Highmark began running a 30-second, three-sentence television advertisement fashioned as a news report (the "News Report Ad"). This News Report Ad, the text of which is attached as Exhibit 1, contains numerous statements that are false and misleading.

47.    Highmark's News Report Ad attempts to respond to a UPMC advertisement, which runs in the background of the News Report Ad, but instead of doing so truthfully and accurately, the News Report Ad makes many false and misleading statements. The News Report Ad begins with a man saying that "UPMC is running a TV ad that quite honestly is trying to deceive you." This statement is false, misleading, and wholly unsubstantiated. UPMC is not trying to deceive anyone, and the content of UPMC's advertisement is truthful.

48.    To further Highmark's efforts to confuse and mislead consumers, Highmark infringes UPMC's intellectual property rights in the News Report Ad by running images from UPMC's own advertisement throughout the length of the News Report Ad without UPMC's permission.

49.    The man in Highmark's News Report Ad continues by saying: "The truth – news story after news story confirms it's UPMC not Highmark that decided to deny access to many Western Pennsylvania families starting in 2015." This statement is also false. UPMC has not "decided to deny access to many Western Pennsylvania families starting in 2015." To the contrary, in 2015, Highmark subscribers will have access to certain UPMC facilities and physicians at in-network benefit levels, and they will have access to all other UPMC facilities

and physicians at out-of-network benefit levels.  Highmark's subscribers will not be "den[ied] access."

50.     The actual meaning of Highmark's false phrase "deny access," along with similar phrases, has been established since 2001.  In a lawsuit filed against UPMC that year, Highmark claimed that a UPMC Health Plan advertisement saying Highmark subscribers would have "no access" to certain UPMC hospitals and physicians was literally false because Highmark subscribers could use those facilities and services on an out-of-network basis.  Highmark argued that the term "access" had to be used in terms of its customary meaning, which means "you can use it."  The United States District Court for the Western District of Pennsylvania agreed with Highmark, holding that subscribers did indeed have "access" to UPMC facilities and doctors, even if through a lower level of out-of-network benefits.  Thus, the District Court found, as Highmark urged, that it was false to say that there was "no access" when a subscriber has out-of-network access to a healthcare provider.

51.     Furthermore, Western Pennsylvania families insured through companies other than Highmark are unaffected by the expiration of certain UPMC commercial contracts with Highmark, yet the News Report Ad omits this material information.  Instead, the News Report Ad states that UPMC's supposed denial of access will impact Western Pennsylvania families without regard to their specific insurance, in an effort to mislead the general public.

52.     Highmark's "deny access" statement is also false because it is not the case that "news story after news story" has confirmed that UPMC is denying access to anyone.  During this portion of the advertisement, a series of three statements from local news stories appear on the screen in rapid succession.  None of these news stories supports Highmark's false claim that UPMC is denying access to anyone.

53.     In addition, Highmark uses these news stories to falsely state that UPMC's own advertisement has been deemed false by the media.  The first statement Highmark shows on the screen is from the *Pittsburgh Tribune-Review*, dated June 22, 2013, and it says: "UPMC Ads . . . 'Purposeful Misrepresentation Of Reality.'"  This statement comes from an editorial, not from a news story or article that purports to report facts.  No "news story" confirms anything, and each of the supposed stories cited predates the UPMC advertisement shown in the News Report Ad and has nothing to do with the displayed UPMC advertisement.

54.     Similarly, Highmark's News Report Ad includes a reference to a news story that aired on KDKA2 and appeared on the news station's website on June 14, 2013.  Highmark's use and display of the "KDKA2" trademark and logo is prominently placed next to the June 14, 2013, headline, "UPMC Board Votes Not to Extend Highmark's Contract."  This placement suggests that KDKA2 endorses Highmark's false claims and the News Report Ad itself.  This is, of course, not true.  KDKA2 merely reported that the UPMC Board had reaffirmed its commitment, first expressed in 2011, not to renew most of its commercial contracts with Highmark after December 31, 2014.  On information and belief, KDKA2 never endorsed the statements in Highmark's advertisement.

55.     The News Report Ad ends with the following "very simple question for UPMC – What right does a charitable tax exempt hospital built with our tax dollars, donations, and grants have to tell any of us we're not allowed to go there?"  This statement falsely states that UPMC has told Western Pennsylvania families that they are "not allowed to go" to UPMC facilities and physicians starting in 2015.  That is simply not true.  In 2015, *anyone* in Western Pennsylvania will be able to go to UPMC's facilities and physicians, on either an in-network or out-of-network basis, depending upon their benefit plans.

### B.      Highmark's Television "Diner Ad"

56.     Highmark also began running a 60-second television advertisement featuring three men having a hypothetical conversation in a diner ("Diner Ad") on or about July 29, 2013. Like Highmark's News Report Ad, its Diner Ad contains statements that are false and misleading.  Attached as Exhibit 2 is a transcript of the Diner Ad.

57.     The Diner Ad begins with a senior in a green shirt telling two other seniors: "Let me get this straight.  First, UPMC says it supports saving West Penn Allegheny Health System, that competition is good.  Then Highmark saves West Penn Allegheny and UPMC says in retaliation, we won't sign a contract that allows Highmark health insurance customers to use UPMC after 2014."  These statements are false and misleading.

58.     First, UPMC has never said that it "won't sign a contract that allows Highmark health insurance customers to use UPMC after 2014."  Indeed, UPMC is *currently* a party to a contract with Highmark, memorialized in the July 2012 Amendments to the 2002 Hospital Contracts, that provides for Highmark subscribers "to use UPMC after 2014" on an in-network basis at certain UPMC facilities, including UPMC Bedford, UPMC Northwest, and Western Psychiatric Institute and Clinic.  Highmark subscribers will also have in-network access to UPMC for emergency services, certain oncology services, and continuing courses of care. UPMC has also committed, and Highmark has publicly confirmed, that Highmark subscribers will have in-network access to UPMC Altoona, Children's Hospital of Pittsburgh of UPMC, and UPMC Mercy beyond 2014.  Highmark's statements, therefore, are false.

59.     Moreover, this statement is also false because all of the men in the advertisement appear to be over the age of 65 and eligible for Medicare.  As noted above, however, UPMC has affirmed that it will honor its commitment to allow in-network access after 2014 for Medicare subscribers.

60.     Later in the advertisement, the diner in the blue shirt states:  "Here's the way I see it.  You should be allowed to choose your own healthcare insurer and your own healthcare provider.  UPMC should not decide for you."  This statement is false.  UPMC will not be making decisions for people about their healthcare insurer or their healthcare provider after 2014, and any contrary suggestion is without factual foundation and wholly unsubstantiated.  Individuals in Western Pennsylvania will be free to choose their healthcare insurance provider and healthcare provider.

### C.     Highmark's Radio Ad

61.     Highmark began running a 60-second radio advertisement featuring a woman's voice ("Radio Ad") on or about July 24, 2013.  Like Highmark's News Report Ad and Diner Ad, the Radio Ad contains false and misleading statements that UPMC will deny access to Highmark subscribers after 2014.  Attached as Exhibit 3 is a transcript of the Radio Ad.

62.     Highmark begins the Radio Ad with the false statement that "UPMC caught many in our region by surprise when it recently announced that at the end of 2014 it will no longer contract with Highmark Health Services, and will deny hundreds of thousands of Western Pennsylvania families open access to its hospitals and doctors."  As an initial matter, there is nothing "surprising" about the fact the 2002 Hospital Contracts will end on December 31, 2014, a date Highmark agreed to under the July 2012 Amendments and which is consistent with UPMC's stated intentions since mid-2011.

63.     In addition, Highmark's statement that UPMC "will deny hundreds of thousands of Western Pennsylvania families open access to its hospitals and doctors" is also false, for the reasons explained in connection with the News Report Ad (*see* paragraphs 46 to 55).  After 2014, Highmark subscribers will have access to many UPMC facilities and physicians at in-network benefit levels, they will have access to the other UPMC facilities and physicians at out-of-

network benefit levels, and subscribers to insurance plans other than Highmark will have in-network and out-of-network benefits per the terms of their plans.

64.     The Radio Ad concludes with the statement that: "UPMC says it wants competition, then prove it.  Because true competition only comes when people have the choice and access to make their own healthcare decisions."  This statement falsely tells the listener that, "at the end of 2014," UPMC will prevent people from having the choice and access to make their own healthcare decisions, which is simply not the case.

**D.     Highmark's Print Ads**

65.     On July 28, 2013, Highmark ran an advertisement in the Sunday edition of the *Pittsburgh Post-Gazette* ("July Print Ad") that likewise contains false and misleading statements. Attached as Exhibit 4 is a copy of the July Print Ad.

66.     The banner of the July Print Ad contains this false and misleading statement: "UPMC wants to close its doors to hundreds of thousands of families."  This is followed by the statement in the smaller text below that "UPMC recently announced a plan to deny hundreds of thousands of western Pennsylvania families open access to its hospitals and doctors starting in 2015."  These statements are false.

67.     UPMC does not want to, and it has not announced a plan to, "close its doors to" or "deny hundreds of thousands of western Pennsylvania families open access to its hospitals and doctors starting in 2015."  As explained above, starting in 2015, Highmark subscribers will have access to many UPMC facilities and physicians at in-network benefit levels, they will have access to the other UPMC facilities and physicians at out-of-network benefit levels, and subscribers to insurance plans other than Highmark plans will have in-network and out-of-network benefits per the terms of their plans.

68.     The July Print Ad is especially egregious because it broadly claims that "UPMC wants to close its doors to hundreds of thousands of families," but never tells the reader that Highmark intended the advertisement to refer to Highmark subscribers.  The July Print Ad, accordingly, falsely and misleadingly tells the reader that UPMC will "close its doors" to undefined and unidentified "families," including Highmark subscribers and subscribers to other health plans.

69.     On August 4, 2013—after receiving a cease and desist letter from UPMC—Highmark ran another similar print advertisement in the Sunday edition of the *Pittsburgh Post-Gazette* ("August Print Ad") that likewise contains false and misleading statements.  Attached as Exhibit 5 is a copy of the August Print Ad.

70.     Like the July Print Ad, Highmark's August Print Ad states that "UPMC has announced a plan to deny hundreds of thousands of western Pennsylvania families open access to its hospitals and doctors starting in 2015."  The August Print Ad goes on to state that "[a]s for UPMC, if it truly supports competition—if it really cares about giving families choice and access—it's time to prove it."  These statements, like nearly identical statements in the July Print Ad and Highmark's other "No Access Campaign" advertisements are false for the reasons explained above.

## IV.    HIGHMARK'S FALSE AND MISLEADING "NO ACCESS CAMPAIGN" IS LIKELY TO INFLUENCE PURCHASING DECISIONS, CONFUSE CONSUMERS, AND INJURE UPMC.

71.     The Highmark "No Access Campaign" advertisements pose a substantial risk of injury to UPMC in the current Western Pennsylvania healthcare and health insurance marketplace, which is undergoing dynamic changes and is characterized by fierce competition for subscribers and patients.

72.     Allowing Highmark to falsely assert that UPMC will "deny access," "close its doors," or otherwise not provide care to Western Pennsylvanians gives Highmark an immediate unfair competitive advantage in the provision of healthcare services.  These false statements attempt to push individuals toward Highmark's own Allegheny Health Network and away from UPMC hospitals and physicians.

73.     These advertisements also are causing and will cause UPMC to lose business, patients, admissions, market share, and goodwill, irreparably tarnishing UPMC's reputation and brand.  Through the false and misleading statements in its "No Access Campaign" advertisements, Highmark portrays UPMC in a bad light, and usurps its goodwill in the community by falsely telling consumers that UPMC is acting improperly in preventing consumers from entering its hospitals or facilities.

74.     UPMC's reputation, goodwill, and brand are irreparably harmed by such false accusations.  In the healthcare industry, a hospital system's reputation, goodwill, and brand are important drivers of charitable donations and patient admissions.  A harm to UPMC's reputation, goodwill, or brand will directly result in pecuniary harm to UPMC.

75.     In addition, these advertisements encourage consumers to use Highmark's Allegheny Health Network hospitals and physicians, and not UPMC's hospitals and physicians, by falsely portraying Highmark as fighting against UPMC's claimed attempt to "deny access." This unfair competitive advantage and attempt to usurp UPMC's goodwill is exacerbated by the improper use of trademarks and other intellectual property, suggesting endorsements or authorizations that, on information and belief, do not exist.

76.     Highmark's false and misleading "No Access Campaign" advertisements unfairly give it a sales and reputational benefit while UPMC is forced to waste time and resources

explaining to the market that individuals still have access to UPMC, according to the terms of their benefit plans, on an in- or out-of-network basis.  UPMC is prevented from using those wasted resources on more productive business or product development or other efforts, weakening the ability of UPMC to compete against Highmark and its newly-formed provider entity in the future.

77.     UPMC is also forced unnecessarily and wastefully to spend money on attorneys' fees and other litigation expenses to stop Highmark's false and misleading "No Access Campaign" advertisements.

78.     Highmark's false and misleading advertisements are irreparably injuring and will continue to irreparably injure UPMC's reputation, UPMC's ability to control its reputation, and consumer goodwill towards UPMC.  Denigrating the UPMC brand, Highmark's "No Access Campaign" states that all Western Pennsylvanians—not just Highmark subscribers—will be "den[ied] access" to UPMC facilities beyond 2014.  Consumers will become frustrated with UPMC and its hospitals and physicians, even though it was Highmark, not UPMC, that created this false public impression that they will be denied care at UPMC hospitals and physicians after 2014.  This is creating and will create irreparable injury to UPMC's brand, goodwill, and reputation that UPMC has worked for years to build.

79.     The harm to UPMC is heightened by the fact that Highmark's "No Access Campaign" advertisements concern healthcare insurance and healthcare, two markets in which consumers rely heavily on insurers and providers to supply them with accurate information about products, services, and any limitations on those products or services.  Consumers are not in a position to independently confirm the truth or falsity of the information contained in Highmark's

advertisements, and they will continue to be misinformed and deceived unless expedited relief (including corrective advertising) is granted.

80.     Consumers are currently assessing insurance offerings, products, and enrollment for next year and beyond 2014.  In assessing insurance offerings, subscribers care deeply about which providers are in-network, which providers are out-of-network, and which providers are not available at all for a particular health insurance product.  This information is often a deciding factor.  It is critical, therefore, that subscribers have correct, accurate, and clear network information when selecting their health plans.  Highmark's false advertisements are likely to influence employers' decisions regarding insurance offerings for 2014 and beyond, as well as consumers' decisions regarding insurance enrollment for 2014 and beyond.

81.     Highmark's false and misleading advertising regarding the ability of Western Pennsylvanians to use UPMC is likely to influence the purchasing decisions of subscribers, potential subscribers, and employers, who will consider the willingness of UPMC to treat patients in determining what plans to purchase.

82.     UPMC will lose revenues when consumers, subscribers, potential subscribers, and employers—influenced by Highmark's false advertising—are led to believe, among other things, that they will not be able to come to UPMC.

83.     UPMC will suffer irreparable injury to its business reputation and goodwill when consumers, subscribers, potential subscribers, and employers—influenced by Highmark's false advertising—are led to believe, among other things, that they will not be able to use UPMC.

84.     Given that Western Pennsylvanians currently decide on a daily basis which doctors and hospitals to visit, Highmark's "No Access Campaign" advertisements that use false and misleading statements are likely to influence where individuals seek treatment today and in

the days, weeks, months and years to follow.  UPMC will suffer irreparable injury to its business reputation and goodwill unless expedited relief is granted as requested below.

85.     The false and misleading statements in the television, radio, and print "No Access Campaign" advertisements are deceptive, confusing, and likely to cause consumer confusion for all of the reasons stated above.

86.     Patients, Highmark subscribers, and others have already been confused by Highmark's advertisements.  UPMC has received telephone calls, Facebook messages, and other communications from consumers who are confused as a result of Highmark's "No Access Campaign" advertisements.  At least one consumer expressed confusion regarding Children's Hospital of Pittsburgh of UPMC, falsely believing that UPMC intended to sever its contract with Highmark for that facility.

87.     Even the *Pittsburgh Tribune-Review* reported on a group of seniors confused by Highmark's advertisements.  In an August 3, 2013 report, the *Tribune-Review* stated that Highmark's Diner Ad "prompted a call" from a woman who indicated that "many seniors living in her high-rise are not sure what's going to happen to them after 2014."  The immediate confusion Highmark's false and misleading advertisements have caused among the public demands expedited relief.

## V.     HIGHMARK REFUSED TO AGREE TO CEASE AND DESIST DISTRIBUTION OF ITS FALSE AND MISLEADING "DENIED ACCESS" ADVERTISEMENTS.

88.     UPMC's efforts to curtail Highmark's flagrant false and misleading advertising without resorting to litigation failed.

89.     In an August 1, 2013 letter, UPMC demanded that Highmark immediately cease and desist publication of its false and misleading "No Access Campaign" television, radio, and newspaper advertisements described above.

90.     In that letter, attached as Exhibit 6, UPMC noted that "it is literally false for Highmark to assert in blanket statements that UPMC is taking or has taken action to 'deny access' or 'close its doors' to Western Pennsylvania families."  UPMC also explained in detail the various reasons why the advertisements are false and misleading.

91.     UPMC's letter asked Highmark to confirm by noon on August 5, 2013, that Highmark would immediately cease use of the false and misleading advertisements, as well as any other similar advertisements that suggest UPMC has denied or will deny access to Highmark subscribers after 2014.

92.     Despite UPMC's request, Highmark did not agree to stop publishing its false and misleading "No Access Campaign" advertisements, making this litigation necessary.

93.     In fact, Highmark's "No Access Campaign" advertisements have continued to run since UPMC sent its cease and desist letter to Highmark, and the advertisements continued to be available on YouTube.com.  Highmark even published a new advertisement—the August Print Ad—with nearly identical false and misleading statements after receiving UPMC's cease and desist letter.

94.     Nor is this the first time Highmark has engaged—very recently—in false and misleading advertising regarding its current and ongoing relationship with UPMC.  Just a few weeks ago, Highmark ran another false and misleading campaign.  Highmark pulled these advertisements after UPMC sent Highmark a cease and desist letter demanding Highmark do so. Highmark will not be harmed by being ordered to immediately pull its false and misleading "No Access Campaign" advertisements.

## CLAIMS

**Count I:  False Advertising in Violation of
Lanham Act § 43(a), 15 U.S.C. § 1125(a)(1)(B)**

95.    UPMC incorporates and realleges paragraphs 1 through 94 by reference.

96.    Highmark has, in commercial advertising and promotion in interstate commerce, deceived and misled consumers to believe all of the false and misleading statements described in detail above.

97.    All of Highmark's representations and statements described above constitute false and misleading statements concerning the nature, qualities, and characteristics of UPMC's products, services, and/or commercial activities in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

98.    Highmark intended to confuse and deceive consumers into believing the false and misleading representations described in detail above.

99.    As a result of Highmark's false and misleading representations, described in detail above, consumers have been and/or are likely to be confused and deceived.

100.    Highmark's false and misleading statements, described in detail above, are material and have influenced and/or are likely to influence employers' decisions regarding insurance offerings for 2014 and beyond, as well as consumers' decisions regarding insurance enrollment for 2014 and beyond.

101.    Highmark's false and misleading statements, described in detail above, are material and have influenced and/or are likely to influence Western Pennsylvanians' decisions regarding where to seek healthcare services today and in the future.

102.    Highmark's advertising activities challenged in this complaint were within the flow of and substantially affected interstate commerce, as described in detail in paragraph 14 above.

103.    As a direct and proximate result of Highmark's unlawful conduct, the goodwill associated with UPMC and its products has been and/or is likely to be diminished, for which there is no adequate remedy at law.

104.    As a direct and proximate result of Highmark's unlawful conduct, UPMC has suffered and/or is likely to suffer damages in the form of irreparable injury to its business reputation and goodwill.

105.    As a direct and proximate result of Highmark's unlawful conduct, UPMC has suffered and/or is likely to suffer damages in the form of lost revenues in an amount not presently known.

106.    Especially in light of UPMC's cease and desist letter, Highmark's other recent false and misleading advertising campaigns, and Highmark's pattern and practice of unlawful conduct against UPMC, Highmark's violations of 15 U.S.C. § 1125(a) are intentional and willful, and entitle UPMC to recover damages, including enhanced damages, in an amount to be determined at trial.

107.    Highmark's intentional and willful violations of 15 U.S.C. § 1125(a) entitle UPMC to recover its reasonable attorneys' fees in an amount to be determined at trial.

108.    Highmark's conduct is continuing and the expected injury from Highmark's future conduct cannot be redressed by money damages, and is therefore irreparable.

109.    An injunction, including an order for corrective advertising, is appropriate to remedy the continuing violation, prevent irreparable harm to UPMC, and further the public interest in fair competition within health insurance markets.

110.    Expedited relief is necessary to remedy the continuing violation, prevent irreparable harm to UPMC, and further the public interest in fair competition within health insurance markets.

### Count II:  Unfair Competition in Violation of Pennsylvania Law

111.    UPMC incorporates and realleges paragraphs 1 through 110 by reference.

112.    Highmark's deceptive conduct, described in paragraphs 95 through 101 and 103 through 110 constitutes unfair competition in violation of Pennsylvania common law.

113.    As a direct and proximate result of Highmark's unlawful conduct, the goodwill associated with UPMC and its products has been and/or is likely to be diminished, for which there is no adequate remedy at law.

114.    As a direct and proximate result of Highmark's unlawful conduct, UPMC has suffered and/or is likely to suffer damages in the form of irreparable injury to its business reputation and goodwill.

115.    As a direct and proximate result of Highmark's unlawful conduct, UPMC has suffered and/or is likely to suffer damages in the form of lost revenues in an amount not presently known.

116.    Highmark's violations of the Pennsylvania common law regarding unfair competition are intentional and willful, and entitle UPMC to recover damages, including enhanced damages, in an amount to be determined at trial.

117.     Highmark's intentional and willful violations of the Pennsylvania common law regarding unfair competition entitle UPMC to recover its reasonable attorneys' fees in an amount to be determined at trial.

118.     Highmark's conduct is continuing and the expected injury from Highmark's future conduct cannot be redressed by money damages, and is therefore irreparable.

119.     An injunction, including an order for corrective advertising, is appropriate to remedy the continuing violation, prevent irreparable harm to UPMC, and further the public interest in fair competition within health insurance markets.

120.     Expedited relief is necessary to remedy the continuing violation, prevent irreparable harm to UPMC, and further the public interest in fair competition within health insurance markets.

## PRAYER FOR RELIEF

WHEREFORE, UPMC respectfully requests that this Court:

a.     Adjudge, declare, and decree that the above-described conduct violates and continues to threaten a violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and the common law of Pennsylvania;

b.     Issue a declaratory judgment, pursuant to 28 U.S.C. § 2201, that the above-described conduct violates and continues to threaten a violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and the common law of Pennsylvania;

c.     Preliminarily and permanently enjoin Highmark, its officers, agents, servants, employees, and all those in active concert or participation with it, from further publication of the advertisements described above in paragraphs 46 through 70 and of any similar advertisements containing these false and misleading claims;

d.      Order Highmark to publish corrective advertising informing the public of its false and misleading "No Access Campaign" advertisements;

e.      Award UPMC three times their damages therefrom and three times Highmark's profits therefrom, after an accounting, pursuant to 15 U.S.C. § 1125(a) and § 1117 and the common law of Pennsylvania;

f.      Award UPMC punitive damages;

g.      Order Highmark to pay reasonable costs and attorneys' fees incurred by UPMC in bringing and maintaining this action pursuant to 15 U.S.C. § 1117 and the common law of Pennsylvania; and

h.      Award any further relief it may deem just and proper.

## DEMAND FOR JURY TRIAL

UPMC demands a trial by jury on all issues triable by jury.


Dated:  August 5, 2013                                Respectfully submitted,


/s/ *Rebekah B. Kcehowski*
Leon F. DeJulius, Jr. (Pa. No. 90383)
Rebekah B. Kcehowski (Pa. No. 90219)
John E. Iole (Pa. No. 47768)
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
Tel: (412) 391-3939
Fax: (412) 394-7959
lfdejulius@jonesday.com
rbkcehowski@jonesday.com
jeiole@jonesday.com

Paul H. Titus (Pa. No. 01399)
Keith E. Whitson (Pa. No. 69656)
SCHNADER HARRISON SEGAL &
LEWIS LLP
Fifth Avenue Place, Suite 2700
Pittsburgh, PA  15222-3001
Tel: (412) 577-5200
Fax: (412) 765-3858
ptitus@schnader.com
kwhitson@schnader.com

*Attorneys for UPMC*